IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 10, 2021 Session

## STATE OF TENNESSEE v. DEANDRE MARRECE ELLIS

**Appeal from the Circuit Court for Montgomery County
No. 63CC1-2018-CR-453  Jill Bartee Ayers, Judge**

_____

### No. M2020-01451-CCA-R3-CD

_____

A Montgomery County jury convicted Defendant, Deandre Marrece Ellis, of second degree murder, tampering with evidence, and possession of a weapon by a convicted felon with a predicate felony involving force or violence, for which the trial court imposed an effective sentence of fifty-one years' incarceration.  In this direct appeal, Defendant challenges the sufficiency of the evidence as it relates to his conviction for tampering with evidence.  He asserts that, when he placed the murder weapon in water inside a toilet tank in a friend's apartment, he intended only to conceal his possession of the gun and that the State failed to prove that his intent was to hinder the police investigation by impairing the gun's "verity, legibility, or availability as evidence."  Following a thorough review, we affirm Defendant's conviction for tampering with evidence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Kendall Stivers Jones (on appeal), Assistant Public Defender-Appellate Division; Roger E. Nell, District Public Defender, and Charles S. Bloodworth (at trial), Assistant District Public Defender, for the appellant, Deandre Marrece Ellis.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; John W. Carney, Jr., District Attorney General; Robert J. Nash and Arthur Bieber, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

In May 2018, Defendant was indicted for first degree premeditated murder in the death of Detrick Mosley, unlawful possession of a firearm by a convicted felon, tampering with evidence, and theft valued at $1,000 or less.[1]  At trial, Tammy Tasker and Michael Peters testified that, on January 26, 2018, they were at work at Harris Propane on Kraft Street in Clarksville when they heard multiple gunshots coming from Brothers Market[2] gas station located next door.  Ms. Tasker and Mr. Peters stated that they looked out the window and saw a man firing a gun into a car.  Ms. Tasker explained that the man fired "pointblank" into the front of the car, ran to the passenger side, and continued to fire into the window. The man then ran across Kraft Street and up Summer Street into the Lincoln Homes apartments.  Ms. Tasker described the man as wearing black pants and a black hoodie and as having a tall, thin build.  Ms. Tasker testified that she went outside and saw a young man who was screaming, "Help me, help me, please.  Somebody help me."  Ms. Tasker stated that the young man was attempting to stop blood coming from the victim's wounds and that she helped the young man apply pressure to the wounds until emergency services arrived.

Edmond Travis, another employee at Harris Propane, testified that he also heard gunshots coming from Brothers Market on January 26, 2018.  Mr. Travis stated that he saw a man in a black hoodie "wearing what looked like black pants, maybe about 5'11, firing into a parked vehicle at the gas pump."  Mr. Travis said that the man continued to fire the gun as he walked around the car.  He said that the man then crossed Kraft Street towards Lincoln Homes, carrying the gun in his hand.

Norman Saunders testified that he was employed by the Clarksville Housing Authority and that he was at Lincoln Homes on January 26, 2018, when he heard gunfire around 3:45 p.m.  Mr. Saunders said that he then saw a "man running and [that] everybody said, 'There he go[es].'"  Mr. Saunders explained that there were multiple security cameras around Lincoln Homes, which were monitored in a maintenance shop on the property.  Mr. Saunders went to the maintenance shop, and when he viewed the monitors, he saw the assailant running around the property "in real time."  Mr. Saunders called police, who met him at the maintenance shop.  Mr. Saunders and the officers "[s]at down and looked at the video, and . . . kept on rewinding it . . . 'til they found out what direction [the assailant]

---

[1] The State dismissed the theft charge prior to trial.

[2] Throughout the record, the location of the shooting is referred to alternatively as Brothers Market and In and Out Market.  For the sake of consistency, we have referred to it as Brothers Market in this opinion.

went in[.]" Mr. Saunders said that he recognized the assailant and that he had seen him previously at Lincoln Homes. He identified Defendant on the video surveillance footage, and a disc containing the surveillance footage was played for the jury. Mr. Saunders said that he was familiar with the apartment buildings in Lincoln Homes, and he identified apartment 18G as the apartment that Defendant was seen entering in the surveillance footage.

The parties then entered a stipulation as to the testimony of Officer Terry Minton, the Crime Scene Commander for the Clarksville Police Department (CPD). Officer Minton stated that, around 4:00 p.m. on January 26, 2018, he was notified of a shooting on Kraft Street. When he arrived on scene, Officer Minton saw the victim's car—a gray Ford Edge with Florida tags—parked beside the fuel pumps at Brothers Market. Officer Minton observed and collected fourteen shell casings from the parking lot. Officer Minton testified that the driver's door of the victim's car was open and that there were projectile strikes on the pillar behind the open door and in the windshield. Additionally, he saw a lead projectile lodged in the dashboard, which was collected before the car was transported to police facilities for further processing.

CPD Officer Jason Hankins testified that, after hearing the report of the shooting on Kraft Street, he responded to the maintenance building at Lincoln Homes where he encountered Mr. Saunders, who provided a description of the assailant and explained that the assailant ran through a field behind the maintenance building. As Officer Hankins viewed the surveillance footage, he reported to other officers the path that the assailant ran. Officer Hankins said that, after the assailant ran behind the maintenance building, he crossed the street and went behind Building 14 where he removed his hoodie. When the assailant came from behind Building 14, he was wearing a white t-shirt. Officer Hankins explained that the assailant "stood there for a brief moment kind of looking around, and then he ran back across towards the field. And then he cut through between the 17 and 18 Building[.]" Officer Hankins stated that a different camera angle showed that the assailant then ran into apartment 18G.

Dr. Emily Dennison of the Nashville Medical Examiner's Office testified that she performed the victim's autopsy. Dr. Dennison explained that the victim suffered three "penetrating gunshot wounds." She testified that the victim's cause of death was gunshot wounds and that the manner of death was homicide.

Tianna Thomas testified that Defendant spent the night with her at her mother's residence the night before the shooting. While at her mother's residence, Ms. Thomas saw Defendant with a black handgun. She said that she saw Defendant with the same gun on the day of the shooting when they went to Lincoln Homes. Ms. Thomas explained that a man named Issac picked her and Defendant up from her mother's residence and drove them

to Lincoln Homes. She stated that Issac was there looking to buy "some pills." They then went to Brothers Market "to see if somebody was up there that knew where to get some pills[.]" Ms. Thomas recalled that, as they approached Brothers Market, she heard someone yelling. When she went inside, she saw Joshua Dycus yelling at the victim, who was "just playing his lottery numbers." The State showed Ms. Thomas video surveillance footage from inside the market, and she identified herself, Mr. Dycus, the victim, and Defendant on the surveillance footage. She said that the surveillance footage showed that the victim pushed Mr. Dycus after Mr. Dycus "squared up with him like he wanted to fight[.]" The surveillance footage from Brothers Market was then shown to the jury.

Ms. Thomas said that, when she entered the store, Mr. Dycus and the victim were arguing and that the store manager was threatening to call police. Ms. Thomas told the victim to "[j]ust leave[,]" but he responded that he "wasn't worried about it." Ms. Thomas also attempted to get Defendant to leave the store, but Defendant told her, "This is my cousin. This is my family. Nah." Ms. Thomas explained that Defendant referred to Mr. Dycus as his cousin and that, while inside the store, Mr. Dycus told Defendant about a physical confrontation Mr. Dycus had with the victim. Mr. Dycus said that the victim "put his hands on him," and Mr. Dycus asked for Defendant's gun. Mr. Dycus pointed out the victim to Defendant because Defendant did not know him. Ms. Thomas testified that Defendant told Mr. Dycus he did not have the gun with him but that she knew that he did. Ms. Thomas said that she got back into the car with Issac, and as they pulled away from the store, she saw Defendant shooting the victim. She said that the victim was sitting in his car and that Defendant fired four or five rounds into the car and stopped. She testified that the victim said, "'Nah, man. Please, don't[,]' [a]nd then [Defendant] kept shooting." Ms. Thomas testified that, after the shooting, Defendant ran across the street into Lincoln Homes.

Ms. Thomas said that she later saw Defendant at the apartment of a friend, Shanice Merriweather, in Lincoln Homes. Defendant called her and asked where she was, and she told him that she was in Ms. Merriweather's apartment, 18G. She said that Defendant entered the apartment a couple of minutes after she did and that he was dressed in jeans and a white t-shirt. Defendant asked Ms. Thomas who the victim was related to, and she responded, "You did it. You killed him, and you didn't even know him[.]" Defendant then "said something like [Mr. Dycus] was his cousin." Ms. Thomas testified that, when police arrived at the apartment, everyone inside ran upstairs. She said that Ms. Merriweather eventually let police inside and that they located the gun after they took Defendant into custody.

Detective William Gilboy of the CPD testified that, on January 26, 2018, he responded to Lincoln Homes after Officer Hankins provided a description of the assailant and said that he "took off into Lincoln Homes behind the 14 Building." Officer Hankins

- 4 -

said that the assailant placed a dark colored hoodie into a trashcan behind Building 14, which Detective Gilboy located and collected as evidence. After retrieving the hoodie, Detective Gilboy went to Building 18 and began knocking on the door to apartment 18G. A woman answered the door and told Detective Gilboy that Defendant was upstairs. Detective Gilboy testified:

> I called for [Defendant] to come out the front; come out with his hands up. He waited a few minutes. Then at one point he showed himself, came down with his hands up, and said that he was coming. He was coming. And I just instructed him to keep his hands up, and he walked out to me.

He said that Defendant was wearing a white t-shirt and jeans.

Sergeant Timothy Finley of the CPD testified that he conducted a gunshot residue kit on Defendant after his arrest.

CPD Officer Nathan Lee testified that he responded to apartment 18G at Lincoln Homes following the shooting. Officer Lee stated that, after Ms. Merriweather gave consent to search the apartment, he searched an upstairs bathroom. He said that, when he lifted the lid of the toilet tank, he found "a black handgun in the water in the tank[.]"

CPD Detective Allen Pendarvis testified that he worked as part of the crime scene team that went to apartment 18G. Detective Pendarvis stated that he collected the handgun from the toilet tank, which he identified as a Glock. Regarding the condition of the gun when he located it, Detective Pendarvis said, "[I]t was submerged in water. The magazine was in the grip of the gun, but it was not fully seated so whenever I went to pick up the gun, the magazine actually fell out. There [were] no bullets located in the magazine or in the chamber." Detective Pendarvis explained that he packaged the gun "along with the water that it was submerged in." A photograph of the gun as it was found inside the toilet tank was submitted to the jury as an exhibit. Detective Pendarvis said that he later assisted in the processing of the victim's car and that police located several projectiles and fragments of projectiles in the car.

Officer Jeffrey Derico of the CPD testified that he collected evidence from the victim's car, including multiple projectiles and fragments.

Dontavious Steele testified that the victim was a close family friend. Mr. Steele recalled that, at the time of the victim's shooting, Mr. Steele was sitting on the porch of his grandmother's residence in Lincoln Homes. Mr. Steele saw the victim's car at the gas pumps at Brothers Market and then heard gunshots. He testified that he saw the assailant run past the victim's car, shooting at it, and then the assailant "[went] back and shot some

more[.]" Mr. Steele said that the assailant fled across Kraft Street into Lincoln Homes. Mr. Steele ran to the victim's car and found the victim leaning over the console; he grabbed the victim's hand and tried to help the victim sit up. Mr. Steele recalled, "He kept trying to talk to me, but I told him just focus on breathing. He was gonna get through it. We could talk later." Mr. Steele testified that a woman assisted him in applying pressure to the victim's wounds.

Shanice Merriweather testified that she lived in apartment 18G at Lincoln Homes. Ms. Merriweather said that, on the afternoon of the shooting, she was walking outside when she saw Defendant run into her residence wearing dark jeans and a white t-shirt. Ms. Merriweather continued to her apartment and found both Defendant and Ms. Thomas inside. Ms. Merriweather said that she stayed inside the apartment for about five minutes and then went to Brothers Market because "[t]hat's where the gunshots came from" and "everybody else was going over there[.]" Ms. Merriweather testified that she remained at the market until the ambulance took the victim away and that she then returned to her apartment with her sisters. Ms. Merriweather said that the people inside the apartment began drinking and smoking marijuana in the living room and that, about thirty minutes later, the police knocked on her door. She said that everyone ran upstairs to the bedrooms and that Defendant went into the upstairs bathroom. Ms. Merriweather agreed that she eventually allowed police into the residence and consented to a search of the property. She testified that Defendant had been to her residence on previous occasions and that she had seen Defendant with a gun before, but she stated that she had not seen Defendant with a gun on the day of the shooting. She acknowledged that the gun found by police in the toilet tank in her bathroom looked like the gun she had seen in Defendant's possession on a previous occasion.

Joshua Dycus testified that he was at Brothers Market on the day of the shooting. He stated that, when he walked into the market and past the victim, he and the victim got into "an altercation." Mr. Dycus explained that the altercation was about an incident a few days prior in which the victim refused to give Mr. Dycus a ride. Mr. Dycus said that he and the victim were arguing and yelling inside the market and that he told the victim, "[I]t ain't straight." Mr. Dycus said that the victim followed him down the chip aisle, pushed him into a freezer door, and then pushed him up against a chip rack. Mr. Dycus continued, "We scuffled for a second and then I walked back out the store." Mr. Dycus testified that the altercation did not involve weapons and that he was not injured during the scuffle. He said that, when he exited the market, Defendant heard him cursing and saw that he was "heated" and that Defendant asked Mr. Dycus if he was okay. Mr. Dycus denied telling Defendant what happened inside the market, and he denied asking for Defendant's gun. Mr. Dycus said that he was not present for the shooting and that he was driving down Kraft Street when he heard the first gunshots. He said that, when police arrived at the scene of

the shooting, he returned to the market and spoke to them about his altercation with the victim and that he later provided a formal statement.

CPD Officer Brittany Matos testified that she responded to Brothers Market following the shooting, as part of the crime scene team, and that she photographed the scene there. When she arrived, she saw the victim's car with bullet holes in the front windshield and in the side and observed numerous .9 mm shell casings in the parking lot.

Jay Russell Davis, II, testified that he worked as a part-time contract employee with the Tennessee Bureau of Investigation's (TBI) crime laboratory in Nashville in the Microanalysis Unit. Mr. Davis stated that, in this capacity, he examined the gunshot residue kit collected from Defendant. He explained that an electron microscopic examination of the kit revealed the presence of particles identified as gunshot-primer residue. He said that the results indicated that Defendant "could have fired, handled, or was near a gun when it fired."

Teri Arney testified that she worked in the Firearms Identification Unit of the TBI crime lab as a part-time contract employee. Ms. Arney said that she examined the firearm collected from the toilet tank. She explained that the weapon was a .9mm Glock semi-automatic pistol with a magazine in the grip that could hold fifteen rounds of ammunition. Ms. Arney explained that the gun came to the crime lab inside a Ziploc bag in water. She testified:

> After I took it out of the bag, I noted that there was some surface rust on the external parts of the gun that I could see. So at that point in time I totally took the [gun] apart and cleaned the rust off, lubricated it, and then reassembled it.

Ms. Arney stated that the rust did not hamper the gun's operation and that she test-fired it to obtain bullets and cartridge case standards for comparison. She stated that she then examined various items of evidence collected by the CPD, including fourteen cartridge cases from the scene of the victim's shooting. Based on her comparison with the standards, Ms. Arney testified that the markings on the cartridge cases were "sufficient to say that all [fourteen] of these cartridge cases had been fired in th[e] Glock pistol."

Following deliberations, the jury found Defendant guilty of the lesser-included offense of second degree murder and tampering with evidence. Defendant then pled guilty to possession of a firearm by a convicted felon.

The trial court sentenced Defendant to thirty-five years for second degree murder, sixteen years for possession of a firearm by a convicted felon, and eight years for tampering

- 7 -

with evidence. The court ordered the sentences for possession of a firearm by a convicted felon and tampering with evidence to run concurrently with each other and the sentence for possession of a firearm by a convicted felon to run consecutively to the sentence for second degree murder, for a total effective sentence of fifty-one years' incarceration.

Defendant filed a timely motion for new trial, which the trial court denied in a written order following a hearing. This timely appeal follows.

## II. Analysis

On appeal, Defendant challenges the sufficiency of the evidence as it relates to his conviction for tampering with evidence. Defendant argues that he did not conceal the gun because discovery of the weapon was only minimally delayed and that his intent, when he placed the gun inside the toilet tank, was to hide the fact that he possessed the gun and not to prevent police from finding it or using it as evidence. The State responds that the evidence is sufficient to support the jury's verdict. The State argues that, taken in the light most favorable to the State, the jury could reasonably find that Defendant did not merely abandon the gun but that he concealed the gun from police intending to impair its availability or use as evidence.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Tennessee Code Annotated section 39-16-503(a)(1) defines the offense of tampering with evidence as follows:

(a) It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to:

(1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding . . . .

Tenn. Code Ann. § 39-16-503(a)(1) (2018).

This statute requires the State to prove three elements beyond a reasonable doubt—"timing, action, and intent." *State v. Hawkins*, 406 S.W.3d 121, 132 (Tenn. 2013) (quoting *State v. Gonzales*, 2 P.3d 954, 957 (Utah Ct. App. 2000)). "The 'timing' element requires that the act be done only after the defendant forms a belief that an investigation or proceeding 'is pending or in progress.'" *Id.*; *see State v. Smith*, 436 S.W.3d 751, 763 (Tenn. 2014). Our supreme court has clarified that the word "pending" in Tennessee Code Annotated section 39-16-503(a) means "impending" or "about to take place." *Smith*, 436 S.W.3d at 763 (quoting *Lumpkin v. State*, 129 S.W.3d 659, 663 (Tex. App. 2004)) (internal quotation marks omitted). Defendant does not challenge the verdict with regard to this first element.

"The 'action' element requires alteration, destruction, or concealment." *Hawkins*, 406 S.W.3d at 132. Here, the State's case against Defendant was premised on his "concealment" of the gun. To "conceal" a thing means "to prevent disclosure or recognition of" a thing or "to place [a thing] out of sight." *Id.* (citing *State v. Majors*, 318 S.W.3d 850, 859 (Tenn. 2010)). In *Hawkins*, our supreme court cited multiple other jurisdictions on the issue of concealment of a weapon, as follows:

[C]ourts have upheld tampering convictions when the defendant threw a knife over a building while fleeing the scene of a stabbing; when the defendant hid his gun in the crawl space under a house; when the defendant threw his gun near a car while fleeing the scene of a shooting; when the defendant hid the gun behind a dresser in his bedroom; when the defendant hid the gun under a mattress behind a barn; when the defendant hid the gun in some bushes and told police it was somewhere else; when the defendant had an accomplice throw the gun away in a wooded area; when the defendant jettisoned the gun next to a road where it was found, partially rusted, ten days later by highway workers; and when the defendant threw bullet casings down a storm drain.

*Hawkins*, 406 S.W.3d at 136-37 (footnotes omitted).

To establish the "intent" element, the proof must show that the defendant intended for his actions "to hinder the investigation or official proceeding by impairing the record's, document's, or thing's 'verity, legibility, or availability as evidence.'" *Id.* at 132 (quoting Tenn. Code Ann. § 39-16-503(a)(1)). Tampering with evidence is a "specific intent" crime. *Id.* (citing *State v. Jackson*, 237 P.3d 754, 758 (N.M. 2010), *overruled on other grounds by State v. Radosevich*, 419 P.3d 176 (N.M. 2018); 3 American Law Institute, Model Penal Code and Commentaries § 241.7 at 180 (1962)). Thus, in this case, the State was required to prove beyond a reasonable doubt that, knowing an investigation was impending or in progress, Defendant concealed the gun in water inside the toilet tank of apartment 18G, intending to impair the gun's availability as evidence. *See id.*

When viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's conviction for tampering with evidence. The evidence established that Defendant shot the victim multiple times, in a public location, in the middle of the day, and in view of multiple witnesses. Defendant then fled from the scene carrying the gun used in the shooting. Defendant went to the apartment of an acquaintance in nearby Lincoln Homes, apartment 18G. On his way to apartment 18G, Defendant rid himself of the dark colored hoodie he was wearing during the shooting, leaving it behind Building 14. Sometime later, while inside apartment 18G, Defendant went into the bathroom, placed the gun in the water inside the toilet tank, and placed the lid back on the tank. Officers were able to track Defendant to apartment 18G after reviewing surveillance footage from Lincoln Homes. After Ms. Merriweather consented to a search of the apartment, an officer located the gun submerged in the water of the toilet tank. From these facts, a jury could reasonably conclude that: (1) Defendant knew an investigation into the victim's death was impending or about to take place when he placed the gun inside the toilet tank of apartment 18G; (2) Defendant concealed the gun used in the shooting by taking it to apartment 18G, submerging it in the toilet tank, and replacing the lid; and (3) he intended to impair the gun's availability as evidence in the investigation by doing so.

Defendant contends that he did not "conceal" the weapon within the meaning of Tennessee Code Annotated section 39-16-503(a)(1) because discovery of the weapon was minimally delayed and because he only intended to distance himself from the gun, rather than to prevent its discovery by police. In other words, he contends that, by putting the gun in the toilet tank, he was attempting to conceal the fact of his possession—not the evidence itself as required by the statute. To support his position, Defendant relies on the facts in *Hawkins*—a case in which the defendant, immediately after the shooting, threw his shotgun on top of snow-covered ground near the crime scene, where it was easily spotted by police upon arrival. The court concluded that the shotgun was merely abandoned by the defendant because it was quickly found by police. The court stated:

- 10 -

The facts of this case are unique. In the heat of the moment, shortly after firing the fatal shot, Mr. Hawkins tossed his shotgun over a fence. He did not immediately leave the crime scene. The fence was short and easy to see through. Nothing actually covered the weapon. Had the area been well-lit, the gun would have been easily seen, especially against the snow that lightly covered the ground. The police appear to have found the shotgun rather quickly, and the shotgun itself as well as the DNA evidence found on the shotgun were successfully produced as evidence against Mr. Hawkins at his trial

*Id.* at 137.

In this case, however, Defendant left the scene of the shooting with the gun, went inside a nearby apartment of an acquaintance, placed the gun inside the toilet tank of her upstairs bathroom, and covered it with the lid. The gun was not easily seen, and it was not recovered until after the police tracked down Defendant to apartment 18G, ordered the occupants out of the residence, obtained consent to search from Ms. Merriweather, and conducted a search of the apartment. As noted by the State, if Defendant merely wanted to distance himself from the gun, he had the opportunity to discard the weapon during his flight from the crime scene, just as he abandoned his hoodie behind apartment 14, but instead, he put the item of evidence in a place where it was less likely to be discovered— inside a toilet tank in an acquaintance's apartment.

The jury could also reasonably infer that Defendant's act of submerging the gun in water inside the toilet tank was an attempt by Defendant to impair the gun's availability as evidence. In a reply brief to this court, Defendant acknowledges that "[c]ompletely submerging a weapon in water would be indicative of an intent to destroy via rust." Although Defendant asserts that he placed the weapon in "a mostly empty toilet tank[,]" the officer that collected the gun testified that it was "submerged" in the water, and the photograph of the weapon inside the tank supports that testimony. Testimony that the gun had surface rust at the time of testing would support a finding that, when he submerged the gun in water, Defendant intended that there would be sufficient rust or damage to the gun to impair testing and/or the retrieval of DNA or fingerprint evidence from the weapon. Defendant suggests that because the gun remained fully operational after its recovery, the evidence is insufficient to prove that he intended to impair its use as evidence. However, the Texas Court of Appeals—relying on a similarly-worded tampering statute—has noted that:

A person acts with the intention to impair the availability of the evidence in a subsequent investigation or proceeding related to the offense when it is the person's conscious objective or desire to impair the availability

- 11 -

of the evidence.  The focus of this element is only whether [the person] intended to impair the availability of the thing by concealing it; it is not an element of the offense that concealment actually impair the evidence's availability.

*Juan Ramon Barron v. State*, No. 11-19-00128-CR, 2021 WL 1432978, at *2 (Tex. Ct. App. Apr. 15, 2021).

Taken in the light most favorable to the State, the facts in this case are sufficient to permit any rational trier of fact to find beyond a reasonable doubt that Defendant, knowing an investigation into the victim's shooting was impending, concealed the gun with the intent to impair its availability as evidence.  Defendant is not entitled to relief from his conviction for tampering with evidence.

### III. Conclusion

Based on the foregoing, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE